IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

HEALTHWERKS, INC.,
SPINE GROUP OF WISCONSIN, LLC,
GREAT LAKES SPINE GROUP, LLC, and
PAUL R. BREITENBACH,                                Case No. 14-cv-93-PP

                Plaintiffs,

and

BIOMET SPINE, LLC,

                Involuntary Plaintiff,

v.

HOWMEDICA OSTEONICS CORP.
d/b/a STRYKER SPINE,

                Defendant,

v.

MIKE ROGERS, SCOTT OLIN,
DAN GRAY, JOHN MURRAY,
NICK NOVAK, ANNIE BRAUER,
and TODD POTOKAR,

                Third-Party Defendants.

---

**ORDER GRANTING BIOMET'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 100); DENYING STRYKER'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 112); GRANTING IN PART AND DENYING IN PART THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 120); AND GRANTING THE SALES REPRESENTATIVES' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 121)**

---

# I.    INTRODUCTION

Before the court are several motions for summary judgment filed by (1) the plaintiffs (Healthwerks, Inc., Spine Group of Wisconsin, LLC, Great Lakes Spine Group, LLC, Paul R. Breitenback) with one of the third party defendants (Todd Potokar), (2) the involuntary plaintiff, Biomet Spine, LLC, ("Biomet"), (3) the defendant, Howmedica Osteonics Corp. d/b/a Stryker Spine ("Stryker"), and (4) the rest of the third party defendants (Mike Rogers, Scott Olin, Dan Gray, John Murray, Nick Novak and Annie Brauer) (collectively "the sales representatives"). In the main, the parties dispute the extended enforceability of the last written contract between "Spine Group" (consisting of Spine Group of Wisconsin, LLC, Great Lakes Spine Group, LLC, and Paul Breitenbach) and Stryker. Dkt. No. 140 at 1. After reviewing the pending motions, briefs, proposed facts, and relevant law, the court will grant in part the motion filed by Spine Group, Healthwerks, and third-party defendant Potokar. Dkt. No. 120. The court will deny Stryker's motion. Dkt. No. 112. The court will grant Biomet's motion. Dkt. No. 100. Finally, the court will grant the sales representatives' motion. Dkt. No. 121. In sum, the court will dismiss Counts I, II, III, IV, V, VII, VIII, IX, and X of the amended counterclaim. The court will grant summary judgment in favor of the plaintiffs on Count I of the amended complaint. The court will allow the parties to proceed to trial on Count VI of the amended counterclaim and Count II of the amended complaint.

2

## II.    RELEVANT UNDISPUTED FACTS

### A. Summary Of The Facts

Stryker and Biomet compete against each other in the spine-related instrument and implant market. Stryker Spine's Civil L.R. 56 Proposed Material Facts In Support of Motion For Summary Judgment, Dkt. No. 114 at ¶1. Both companies manufacture and sell spinal instruments and implant products. Id. In 2005, Stryker granted Spine Group the exclusive right to distribute its products in Wisconsin and Northern Michigan.[1] Id. at ¶6. Spine Group employed the third party defendants—Mike Rogers, Scott Olin, Dan Gray, John Murray, Nick Novak and Annie Brauer—to act as sales representatives for the products. Id. at ¶17. Spine Group failed, however, to execute sales representative agreements ("SRAs") with Brauer and Murray. Id. at ¶¶17-18. In 2010, Todd Potokar started working with Spine Group. ¶31.

In January 2008, the parties reaffirmed their relationship based on terms similar to those in the 2005 agreement, but through two separate agency agreements ("the 2008 agreements"). Id. at ¶8. When the 2008 agreements expired, Spine Group continued to distribute Stryker's products while the parties negotiated a new agreement. Id. at ¶59; Plaintiffs' and Third-Party Defendants' Proposed Material Facts in Support of Their Motions For Summary Judgment, Dkt. No. 138 at ¶¶14, 15, 53. Biomet proposed a contract during the same time period. Dkt. No. 114 at ¶114. The plaintiffs filed the complaint in

---

[1] The 2008 agreements also reference Iowa, but the parties did not raise this in the briefing. See Dkt. No. 119-100 at 50.

3

this case after Spine Group and Healthwerks entered into a contract with Biomet, rather than with Stryker. Id. ¶114.

**B. Stryker's Contract With Spine Group**

Among other things, the 2008 agreements contained prohibitions on disclosing confidential information, a non-compete provision ending one year after termination of the agreements, obligations requiring Spine Group to procure SRAs with express language, and obligations requiring both parties to follow set procedures upon termination. Id. at ¶¶9, 12, 14-16, 59.

The 2008 agreements started with an "Initial Term" encompassing a one-year period, which automatically extended for two years—until December 31, 2010—because Spine Group met its performance quotas. Id. at ¶34. Stryker could extend the Initial Term only if it notified Spine Group "in writing not less than sixty (60) days prior to the last day of the Initial Term that it desires to extend this Agreement." Dkt. No. 138 at ¶15.

On December 9, 2010, instead of extending the existing agreements, Stryker sent a revised renewal agreement to Spine Group. Dkt. No. 114 at ¶36. Spine Group did not sign that agreement, and the 2008 agreements terminated on December 31, 2010. Id. at ¶36; Biomet Spine, LLC's proposed material facts in support of its motion for summary judgment Dkt. No. 102 at ¶17. Termination triggered the availability of the one year non-compete and termination procedures, but neither party initiated the procedures. Dkt. No. 114 at ¶¶12, 59. Instead, the parties continued to negotiate. Dkt. No. 138 at ¶53.

4

**C. Negotiations Between Spine Group And Stryker**

As of August 2013, two and a half years into negotiations, Stryker and Spine Group still had "major contract concerns." Id. at ¶53. At this point, Stryker proposed an extension agreement retroactively changing the termination date of the 2008 agreements, but Spine Group did not sign. Dkt. No. 102 at ¶¶23, 26. The parties met again in September to negotiate, but no contract resulted. Dkt. No. 114 at ¶121. In December, the parties scheduled telephone conferences to discuss the contract, and Stryker sent a revised agency agreement on January 6, 2014. Id. at ¶¶123, 124, 127, but see Dkt. No. 163 at 55 (Spine Group disputes that the conferences actually happened). Despite not having a contract, Spine Group continued to sell Stryker products and maintain the business relationship. See e.g. id. at ¶125 (On December 20, 2013, Breitenbach asked his assistant to register him and a few representatives for Stryker's national sales meeting, set to begin on January 16, 2014); Id. at ¶128 (Potokar left a voicemail, on January 6, 2014, for one of Stryker's sales leaders, stating that he called to go through the 2014 budgeting exercise).

On January 14, 2014, Spine Group informed Stryker that it was terminating their relationship. Id. at ¶132. Stryker sent a reminder email to Spine Group concerning its ongoing obligations, including the one year non-compete. Id. at ¶134.

5

**D. Negotiations Between Biomet And Spine Group**

In 2013, there was minimal overlap between Biomet's and Stryker's customers in the region served by Spine Group. Id. at ¶74. In early 2013, during the same period that Stryker and Spine Group were negotiating, Spine Group and Biomet began meeting to discuss a new partnership and to assess Spine Group's obligations to Stryker. Id. at ¶¶75, 95; Dkt. No. 102 at ¶31; Dkt. No. 138 at ¶53. On May 13, 2013, Potokar proposed merging Spine Group with another company, called Healthwerks, which would become Biomet's distributor. Dkt. NO. 102 at ¶35.

Spine Group negotiated terms with Biomet throughout much of 2013. Id. at ¶37. On June 27, 2013, Spine Group provided Biomet with signed copies of the 2008 agreements. Dkt. No. 114 at ¶95. Biomet and Spine Group entered into a mutual non-disclosure agreement on July 16, 2013, id. at ¶88, and outside counsel exchanged emails concerning restrictions on disclosing confidential materials in September of 2013, id. at ¶101.

On December 12 and 13, 2013, the sales representatives signed SRAs with Biomet. Id. at ¶¶112-13. On December 26, 2013, Spine Group, Healthwerks, and Biomet executed an exclusive SRA, effective January 1, 2014 (later amended to January 14, 2014). Id. at ¶114; Dkt. No. 102 at ¶38. Finally, Biomet, Healthwerks, and Spine Group executed an indemnity agreement in the event that Stryker decided to sue. Dkt. No. 114 at ¶116.

Healthwerks became Biomet's distributor on January 14, 2014. Dkt. No. 102 at ¶40.

### E. Litigation Commences

On January 15, 2014, Healthwerks and Spine Group filed a complaint in state court, seeking a declaratory judgment that the 2008 agreements no longer were enforceable. Dkt. No. 1-1. Stryker removed the case to this court on January 28, 2014. Dkt. No. 1. On February 27, 2014, the parties filed a joint submission substantiating jurisdiction. Dkt. No. 19. On September 26, 2014, Stryker filed an answer, counterclaims, and a third party complaint. Dkt. No. 40.

The court resolved two motions to dismiss and a prior summary judgment motion. Dkt. No. 39; Dkt. No. 81.

On June 15, 2015, the plaintiffs filed an amended complaint, Dkt. No. 86, and Stryker filed an amended counterclaim and third-party complaint, Dkt. No. 87. Biomet filed its summary judgment motion on October 13, 2015, Dkt. No. 100. On November 16, 2015, Stryker (Dkt. No. 112), Spine Group, Healthwerks and Potokar (collectively "the plaintiffs") (Dkt. No. 120); and the sales representatives (Dkt. No. 121) filed their motions for summary judgment. All counts of the amended complaint, amended counterclaim and third party complaint are at issue. The court will address each count in turn.

### III.   SUMMARY JUDGMENT STANDARD

A court must grant summary judgment when "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those "facts that might affect the outcome of the suit under the governing law," and a dispute about a

7

material fact is genuine if a reasonable jury could find in favor of the nonmoving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

When determining whether summary judgment is appropriate, the court views all facts and draws all reasonable inferences in favor of the nonmoving party. <u>Herzog v. Graphic Packaging Int'l, Inc.</u>, 742 F.3d 802, 806 (7th Cir. 2014). But, if the court "cannot resolve the conflict between these two positions without deciding which side to believe," summary judgment is not appropriate. <u>Wolf v. Buss (America) Inc.</u>, 77 F.3d 914, 922 (7th Cir. 1996)(quoting <u>Sarsha v. Sears, Roebuck & Co.</u>, 3 F.3d 1035, 1041(7th Cir. 1993)). Credibility determinations and choosing between competing inferences is a jury function. <u>Id.</u>

With that said, "inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." <u>Herzog</u>, 742 F.3d at 806 (quoting <u>Tubergen v. St. Vincent Hosp. & Health Care Ctr., Inc.</u>, 517 F.3d 470, 473 (7th Cir. 2008)). The opposing party cannot simply rely on allegations or denials in its pleadings; it must also "introduce affidavits or other evidence setting forth specific facts showing a genuine issue for trial." <u>Anders v. Waste Mgm't of Wis.</u>, 463 F.3d 670, 675 (7th Cir. 2006). "[A] party will be successful in opposing summary judgment only when that party presents definite, competent evidence to rebut the motion." <u>EEOC v. Sears, Roebuck & Co.</u>, 233 F.3d 432, 437 (7th Cir. 2000)(quoting <u>Smith v. Severn</u>, 129 F.3d 419, 427 (7th Cir. 1997)). Thus, a court appropriately grants summary judgment "against a party who fails to make a showing sufficient to establish the existence of an

8

element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## IV.     CHOICE OF LAW ANALYSIS

The 2008 agreements contain a New Jersey choice of law provision. Dkt. No. 87 at ¶ 44. Because the parties dispute whether New Jersey or Wisconsin law governs the claims arising out of the 2008 agreements, the court must start with a choice-of-law analysis. Dkt. No. 158 at 7; See Auto-Owners Ins. Co. v. Websolv Computing, Inc., 580 F.3d 543, 547 (7th Cir. 2009) (quoting Wood v. Mid-Valley Inc., 942 F.2d 425, 427 (7th Cir. 1991))("Courts do not worry about conflict of laws unless the parties disagree on which state's law applies.").

"Where a district court's jurisdiction is based on diversity . . . the court must follow the choice of law rules of the forum state to determine the applicable substantive law." Progressive N. Ins. Co. v. Mick White Renovations, No. 04 C 7465, 2007 WL 899398, at *2 (N.D. Ill. Mar. 16, 2007)(citations omitted). Under Wisconsin choice of law principles, a contractual choice of law provision is enforceable only if it does not contravene important state law public policies that would apply if the contract did not contain a choice of law provision. Drinkwater v. Am. Family Mut. Ins. Co., 714 N.W.2d 568, 573-574 (Wis. 2006). Essentially, courts determine (1) the presumptive state law if no choice of law provision existed and (2) whether enforcing the forum clause in the contract would contravene important public polices of the presumptive state. Id.

9

In the absence of a choice-of-law provision, "the law of the forum should presumptively apply unless it becomes clear that nonforum contacts are of the greater significance." Id. at 575-76 (quoting State Farm Mut. Auto. Ins. Co. v. Gillette, 641 N.W.2d 662, 676 (Wis. 2002)). Wisconsin courts apply the "grouping of contacts" rule to determine the state with which the contract has its most significant relationship. State Farm Mut. Auto. Ins. Co., 641 N.W.2d at 671 (citing Haines v. Mid-Century Ins. Co., 177 N.W.2d 328 (1970)). "Relevant contacts include: [1] place of contracting; [2] the place of negotiation of the contract; [3] the place of performance; [4] the location of the subject matter of the contract; and [5] the respective domiciles, places of incorporation and places of business of the parties." Sybron Transition Corp. v. Sec. Ins. Co. of Hartford, 107 F.3d 1250, 1255 (7th Cir. 1997)(quoting Hystro Prods., Inc. v. MNP Corp., 18 F.3d 1384, 1387 (7th Cir. 1994)). The quality of the contacts determines which contacts are significant. Sybron Transition Corp., 107 F.3d at 1255.

The 2008 agreements have the most significant relationship with Wisconsin. Spine Group distributed Stryker products in Wisconsin and Michigan. Dkt. No. 114 at ¶6. The collective parties referred to in this decision as "Spine Group" are Wisconsin companies and residents. Dkt. No. 138 at ¶1; Dkt. No. 19 at ¶1-3. The only ties these contracts had to New Jersey were the fact that Stryker is a New Jersey corporation and the fact that the contracts provide a New Jersey choice of law provision. Dkt. No. 87 at ¶1, 44. Because

10

the contract covers product sales in Wisconsin with Wisconsin companies and residents, it follows that Wisconsin law should apply.[2]

Moving on to the second step, applying New Jersey law would contravene Wisconsin public policy. Wisconsin has a strong public policy invalidating any covenant imposing an unreasonable restraint on employment. Wis. Stat. § 103.465. The purpose of this law is to encourage mobility of workers. See, e.g. Farm Credit Servs. of N. Cent. Wis., ACA v. Wysocki, 627 N.W.2d 444, 447 (Wis. 2001)(citing Gary Van Zeeland Talent, Inc v. Sandas, 267 N.W.2d 242 (1978)). Wisconsin courts will not enforce a provision that imposes an unreasonable restraint, "even as to any part of the covenant or performance that would be a reasonable restraint." Wis. Stat. §103.465. New Jersey has a similar standard requiring reasonable covenants, but, in contrast to Wisconsin courts, if a New Jersey court finds a clause to be unenforceable, "rather than deem the covenant void ab initio, [c]ourts will enforce them to the extent reasonable under the circumstances." Richards Mfg. Co. v. Thomas & Betts Corp., No. CIV. 01-4677, 2005 WL 2373413, at *4 (D.N.J. Sept. 27, 2005).

Wisconsin, then, requires the employer to craft, at the outset, covenants which contain only such restrictions are reasonably necessary; if the employer includes unreasonable restrictions, the entire covenant is unenforceable. New Jersey, in contrast, will not deem the entire covenant unenforceable if it

---

[2] As Wisconsin clearly has the most significant relationship with the contract, it is not necessary for the court to analyze the five choice-influencing considerations. A court proceeds to this step only if the court cannot clearly identify a state with the most significant relationship. Drinkwater, 714 N.W.2d at 576.

11

contains unreasonable restrictions. Rather, New Jersey law encourages courts to try to partially enforce the covenants if they can do so "without injury to the public and without injustice to the parties." Id. If this court were to apply New Jersey law, it would contravene Wisconsin's stronger public policy against unreasonable restraints. The court concludes that Wisconsin law governs this dispute.

## V. ANALYSIS OF CLAIMS

### A. Stryker Does Not Have A Breach Of Contract Claim Against Spine Group Or The Sales Associates.

In Count I of the amended counterclaim, Stryker alleges that Spine Group breached several provisions of the 2008 agreements. Dkt. No. 87 at ¶116. In Count VIII of the amended counterclaim, Stryker alleges that the sales representatives breached the sales representative agreements. Id. at ¶219.

In direct contrast, the plaintiffs as, in Count I of the amended complaint, that the court find that the 2008 agreements were no longer enforceable after January 1, 2012; in other words, they ask the court to find that there were no contracts in place with Stryker that they could have breached. Dkt. No. 86 at ¶46.

Under Wisconsin law, a plaintiff must demonstrate three elements in order to prove a breach of contract claim: (1) that a valid contract existed (2) that the defendant breached that contract and (3) that damages flowed from that breach. Matthews v. Wisconsin Energy Corp., 534 F.3d 547, 553 (7th Cir. 2008) (citing Nw. Motor Car, Inc. v. Pope, 187 N.W.2d 200 (Wis. 1971)).

12

i. *The First Element (Existence of a Valid Contract): Spine Group and Stryker did not have a valid contract after December 31, 2010.*

Spine Group does not dispute the existence of the 2008 agreements or their terms. Dkt. 140 at 5. The parties dispute only whether any of the terms extended beyond December 31, 2011. Id. at 5.

a. The 2008 agreements expired on December 31, 2010.

The 2008 agreements terminated under an express provision requiring Stryker to extend the agreements, in writing, no less than sixty days prior to the last day of the initial term. Dkt. No. 138 at ¶15. Instead of extending the terms in writing, Stryker sent a revised renewal agreement which Spine Group did not execute. Dtk. No. 114 at ¶36. Because Stryker did not extend the agreements and because the parties failed to enter into a new contract, the 2008 agreements terminated on December 31, 2010, by their own terms. Dkt. No. 102 at ¶17. As a result, the one year non-compete restriction lapsed on December 31, 2011. Dkt. No. 138 at ¶14-15.

b. The only provisions in the 2008 agreements which extended beyond December 31, 2011—the confidentiality provisions—are not enforceable.

Even though the 2008 agreements terminated on December 31, 2010, the express language of the agreement prohibited disclosure of confidential information for an unlimited time period. Dkt. No. 114 at ¶ 9. This type of confidentiality provision is unenforceable under Wis. Stat. §103.465,[3] which provides:

---

[3] Stryker argues that Wis. Stat. §103.465 does not apply to the contract between Stryker and Spine Group. Dkt. No. 158 at 7. This is an interesting

> A covenant by an assistant, servant or agent not to compete with his or her employer or principal during the term of the employment or agency, or after the termination of that employment or agency, within a specified territory and during a specified time is lawful and enforceable only if the restrictions imposed are reasonably necessary for the protection of the employer or principal. Any covenant, described in this section, imposing an unreasonable restraint is illegal, void and unenforceable even as to any part of the covenant or performance that would be a reasonable restraint.

See also Friemuth v. Fiskars Brands Inc., 681 F. Supp. 2d 985, 989 (W.D. Wis. 2010)("The Wisconsin Supreme Court has indicated that the lack of any time limitation renders a restrictive covenant unreasonable per se.")(citing Gary Van Zeeland, 267 N.W.2d at 250). Although the statute appears to address only non-compete provisions, the Wisconsin Supreme Court also applied it to unreasonable non-disclosure agreements in Gary Van Zeeland Talent, Inc. v. Sandas, 267 N.W.2d at 250. In that case, the provision at issue provided that "the employee will never, without time limitation, disclose the list of customers to any person." Id. at 250. The court noted that "[e]ven were this customer list

---

argument, considering the fact that Stryker argues that Spine Group owes it a fiduciary duty, as an agent would. Dkt. No. 87 at ¶238. In any event, the contract explicitly refers to Spine Group as an independent contractor. Dkt. No. 119-99 at ¶14. This court finds, however, that the 2008 agreements fall within the scope of Wis. Stat. §103.465 because the statute is meant to be construed liberally. See Priority Intern. Animal Concepts, Inc. v. Bryk, No. 12-C-150, 2012 WL 1995113, *6 (E.D. Wis. June 1, 2012)(applying the statute to a similar relationship); Heyde Companies, Inc. v. Dove Healthcare, LLC, 654 N.W.2d 830, 834 (Wis. 2002)(construing the statute liberally; but see County Materials Corp. v. Allan Block Corp., 431 F.Supp.2d 937, 950 (W.D. Wis. 2006)(refusing to extend the scope of Wis. Stat. §103.465 to an agreement to use patented technology); H&R Block Eastern Tax Services, Inc. v. Vorpahl, 255 F.Supp.2d 930, 934 (E.D. Wis. 2003)(refusing to extend the scope of Wis. Stat. §103.465 to franchise agreement).

14

a trade secret, subject to protection within a reasonable geographic area and for a reasonable period of time, this provision, which sets no limits with respect to either is unreasonable and void." Id.

> Where a restraint of trade is tolerated, it is permitted only to the extent absolutely necessary to afford reasonable protection. As indicated above, restraints may be unreasonable by a limitation that is overbroad in terms of geographic area or time. A facet of the time limitation which must be considered in determining its reasonableness is the extent to which the information is permanently valuable to the employer.

Id.

The confidentiality provisions in the 2008 agreements provided that Spine Group could not disclose confidential information "during the term hereof and after the termination of this Agreement for any reason whatsoever . . . ." Dkt. No. 114 at ¶9. Stryker argues that there is an implicit time limitation in the definition designating confidential information as information "generally [not] known in the industry." Dkt. No. 158 at 13. The court disagrees. There is no evidence that the parties contemplated a date certain, or a specific number of years, until Stryker's information would be "generally known in the industry." Restricting disclosure of information not "generally known in the industry" does not imply a time limitation, because there is no way to know when such information might become generally known.

Stryker, therefore, cannot prove the first element of a breach of contract claim—the existence of a valid contract—for any conduct occurring after the non-compete provision lapsed on December 31, 2011, because the only

obligations Spine Group had to Stryker after December 31, 2011 were invalid restrictions under Wis. Stat. §103.465.

    *ii.*    *The Second Element (Breach of a Valid Contract): Spine Group breached the 2008 agreements prior to their expiration; the sales representatives did not breach the sales representative agreements.*

Stryker alleges that while the 2008 agreements remained in effect—prior to December 31, 2011—Spine Group breached the following provisions of the agreements: (1)confidentiality and non-disclosure, (2) procurement and production of SRAs, (3) express language required to be included in SRAs, (4) duties upon termination, and (5) non-competition provisions. Dkt. No. 87 at ¶116. Stryker also alleges that the sales representatives breached the SRAs (of which it was a third party beneficiary) by selling Biomet products. Id. at ¶219.

The court finds that Spine Group breached the agreements during the period in which the contract could be enforced, in two ways. First, the contract required Spine Group to execute SRAs with all of its sales representatives, and to include specific language in those agreements. Dkt. No. 114 at ¶¶14, 16. Spine Group admits that it did not obtain SRAs from two of the sales representatives—Brauer and Murray. Id. at ¶18. Second, the contract provided that upon its termination, Spine Group was required to turn over its confidential information and return all products. Dkt. No. 87 at ¶132. Spine Group did not do this—it continued to sell products for Stryker. Dkt. No. 114 at ¶59. Stryker has proven the first and second elements of breach of contract as to Spine Group.

16

The court finds, however, that the sales representatives did not breach the SRAs. The SRAs are valid contracts, enforceable by Stryker as a third party beneficiary, only to the extent that Spine Group had a valid contract with Stryker. As discussed above, the 2008 agreements between Stryker and Spine Group expired on December 31, 2010, and the one-year non-compete provision expired on December 31, 2011. The sales representatives did not sign SRAs with Biomet until December 2013, well after Spine Group's agreements with Stryker had terminated. Dkt. No. 102 at ¶¶ 17 111, 112. Stryker has failed to prove the first and second elements of a breach of contract claim against the sales representatives.

     iii.    *The Third Element (Damages): Stryker did not suffer damages from the breach.*

While the court concludes that Spine Group did breach the contract with Stryker by not signing SRAs with all the sales representatives, and by failing to return (and continuing to sell) its products, Stryker has not provided sufficient information to support the third element of a breach-of-contract claim—the damages element.

A breach without damages does not warrant recovery on a breach of contract claim. East Lake Towers Corporate Center Ltd. Partnership v. Scott Paper Co., 347 F.Supp.2d 629, 633 (E.D. Wis. 2004). Stryker alleges numerous damages from Spine Group's breach. Dkt. No. 87 at ¶137. Mainly, it alleges that it lost millions of dollars in revenue, including a 75% drop in the territory. Dkt. No. 113 at 15-16. Additionally, it alleges that the *en masse* departure of the plaintiffs and sales representatives caused harm beyond monetary losses

17

because of the disclosure of confidential information and interference with customer relationships. Id.

As the court explained above, the agreements were not enforceable past January 1, 2012, including the provisions requiring SRAs. No reasonable jury could find that Stryker's loss of territory was based on conduct occurring before negotiations started with Biomet in 2013. Further, Stryker's argument that Spine Group failed to follow the termination procedures is not persuasive, when Stryker's conduct indicates that Stryker wanted Spine Group to continue distributing its products.

Because Stryker's damages did not flow from the alleged conduct of Spine Group or the sales representatives, the court will grant summary judgment in favor of the plaintiffs and the sales representatives, and will dismiss Counts I and VIII of the amended counterclaim.

> iv. *Because the court finds that the contract expired on December 31, 2010, the court will grant summary judgment in favor of the plaintiffs on Count I of the amended complaint, and deny summary judgment .*

In Count I of the amended complaint, the plaintiffs ask the court to find that the 2008 agreements terminated no later than January 1, 2011, and that the non-compete provisions terminated no later than January 1, 2012. Dkt. No. 86 at ¶53. The court agrees that from January 1, 2012 through the present, the 2008 agreements were no longer binding on the plaintiffs or any of their agents or representatives. The court will grant summary judgment in favor of the plaintiffs on Count I of the amended complaint. For the same

18

reasons, the court will deny Stryker's request for summary judgment as to Counts I and VIII of the amended counterclaim and third-party complaint.

### B. Stryker Did Not Have An Implied Contract With Spine Group

In Count III of the amended counterclaim/third-party complaint, Styker alleges that Stryker and Spine Group had an implied contract tracking the material terms of the 2008 agreements. Dkt. No. 87 at ¶¶156-57.

A "contract is implied in fact where the intention . . . is not manifested by direct or explicit words between the parties." Theuerkauf v. Sutton, 306 N.W.2d 651, 658 (Wis. 1981)(quoting Erickson v. Goodell Oil Co., Inc., 180 N.W.2d 798 (1970)). Instead it "is to be gathered by implication or proper deduction from the conduct of the parties, language used or things done by them, or other pertinent circumstances attending the transaction." Id.

Although "Wisconsin courts are wary of implying terms into a contract to which the parties have not expressly agreed," the courts will allow a claim to survive "to the extent that it is reasonable to infer from the course of dealings that the parties understood the nature of plaintiff's provision of certain services and agreed to it." Fleming Companies, Inc. v. Krist Oil Co., 324 F.Supp.2d 933, 944 (W.D. Wis. 2004); Dickman v. Vollmer, 736 N.W.2d 202, 208 (Wis. Ct. App. 2007)("An implied contract may be established by the parties' conduct without any words being expressed in writing or orally, if from such conduct it can fairly be inferred that the parties mutually intended to agree on all the terms.") It follows that a contract implied in fact arises from "mutual meeting of the minds and of intention to contract." Schaller v. Marine Nat. Bank of Neenah,

19

388 N.W.2d 645, 649 (Wis. Ct. App. 1986)(citing <u>Theuerkauf,</u> 306 N.W.2d at 657).

Styker alleges that the course of dealings between Stryker and Spine Group created an implied contract, which included material terms of the 2008 agreements. Dkt. No. 87 at ¶¶156-57. Spine Group allegedly breached this implied contract by, among other things, terminating the agreement without cause and distributing competing products in the region. <u>Id.</u> at ¶151. The court finds that the parties did not manifest intent to be bound by the terms of the 2008 agreements.

First, the fact that the parties were negotiating a new contract demonstrates a lack of intent to contract at the 2008 terms. The Seventh Circuit has stated that "evidence that the parties were negotiating a new contract rebuts the presumption" that a contract exists when parties "continue[] to do business governed" by the terms of an expired contract. <u>Consol. Bearings Co. v. Ehret-Krohn Corp.</u>, 913 F.2d 1224, 1230 (7th Cir. 1990)(citing <u>Foster v. Springfield Clinic</u>, 410 N.E.2d 604, 607 (1980)). Although this case interprets Illinois law, the reasoning is persuasive in this context. Continued negotiations demonstrate an intent *not* to be bound by a previous contract.

The parties were negotiating a new contract during the time that Stryker alleges that an implied contract existed. <u>See e.g.</u> Dkt. No. 114 at ¶127. But Stryker kicked off negotiations by sending Spine Group a *new* contract, instead of extending the 2008 agreements. <u>Id.</u> at ¶36. After an extended period of time

20

without a contract, Stryker proposed a *retroactive* extension agreement—implying that the 2008 agreements were not currently enforceable—which Spine Group did not sign. Dkt. No. 102 at ¶26. Evidence that Spine Group continued to sell Stryker products and operate as if some terms were still in place is not enough to overcome evidence demonstrating that the parties had not had a meeting of the minds as to all the terms. See Consol. Bearings Co., 913 F.2d at 1230.

Second, the 2008 agreements preclude a finding that there was an implied contract. The parties included the following clause in the 2008 agreements: "[n]o modifications or waiver of any part of th[e] agreement shall be binding upon either party unless in writing." Dkt. 140 at 11. An implied contract would amount to a waiver of the express provision in the 2008 agreements stating that Strkyer had to extend the agreement "in writing not less than sixty (60) days prior to the last day of the Initial Term . . . ." Dkt. No. 138 at ¶15. Stryker's argument that Spine Group had to follow the precise terms of the contract necessarily implies that Stryker had to follow the "no modifications or waiver" provision. Judge Stadtmueller raised this point in his order denying the motion to stay the case for arbitration:

> Moreover, as noted above in Section Two, each of the Agency Agreements provides that "[n]o modifications or waiver of any part of th[e] Agreement shall be binding upon either party unless in writing." (Docket # 7–1 at 47 and 100); (Docket # 21 at 9). Here, it is undisputed that the Agency Agreements expired by their terms on December 31, 2010. (Docket # 7–1 at 1[1[ 1–10). To be sure, the record contains no evidence of a written modification of the Agency Agreements' terms. *Nissan North America, Inc. v. Jim M'Lady Oldsmobile, Inc.,* 486

21

F.3d 989, 997 (7th Cir.2007) ("Nissan's argument would render meaningless the provision of the Dealer Agreement that required all changes to the agreement to be made in a writing signed by both parties.").

Healthwerks, Inc. v. Stryker Spine, No. 14-CV-93-JPS, 2014 WL 4388586, at *2 (E.D. Wis. Sept. 5, 2014).

A reasonable jury could not find that the parties intended to remain bound by all the terms of the 2008 agreements beyond December 31, 2011, or that there was an implied contract beyond that date. The court will grant summary judgment in favor of the plaintiffs as to Count III, and will dismiss Count III of the amended counterclaim.

### C. Stryker Does Not Have an Estoppel Claim Against Spine Group.

Stryker captioned Count VII of the amended counterclaim, "Promissory and Equitable Estoppel (In the Alternative)." Dkt. No. 87 at 39. In this count, Stryker argues that because Spine Group continued to negotiate a new agreement, and because it didn't tell Stryker that it had, at the same time, been negotiating with Biomet, Spine Group misled Stryker into letting it continue to act as its agent. Dkt. No. 87 at ¶¶204-209. It alleged that it relied on this misinformation to its detriment, and it asked the court to bar Spine Group from benefitting from any continued relationship it had with Stryker. Id. at ¶112[4]. The caption line of Count VII indicates that Stryker pled this claim "[i]n the [a]lternative," id. at page 39; in its brief, Stryker argues that it pled the

---

[4] The amended counterclaim numbered the paragraphs in Count VII from 200 to 209, then numbered the next two paragraphs following 209 as "111" and "112." Dkt. No. 87 at 40. The amended counterclaim then returns to paragraph 210 in the first paragraph of Count VIII. Id. at 41.

estoppel cause of action "in the event the Court (or fact finder) determines that an implied contract *did not exist.*" Dkt. No. 158 at 26.

Stryker titled Count VII a claim for both promissory and equitable estoppel. The difference between promissory estoppel and equitable estoppel lies in the intended use. See Baures v. North Shore Fire Dept., 664 N.W.2d 113, n. 7 (Wis. Ct. App. 2003). Promissory estoppel is used as a sword while equitable estoppel is a shield. Id. Wisconsin does not recognize equitable estoppel as a claim. Schuetta v. Aurora Nat. Life Assur. Co., 30 F.Supp.3d 800, 803 (E.D. Wis. 2014). Thus, the court will not analyze Stryker's claim for equitable estoppel.

"To prevail on a promissory estoppel claim, a plaintiff must present evidence establishing 1) a promise; 2) on which the promisor should reasonably expect to induce action or forbearance; 3) which did induce such action or forbearance; and 4) that injustice can be avoided only by enforcement of that promise." Beer Capitol Distributing, Inc. v. Guinness Bass Import Co., 290 F.3d 877, 880 (7th Cir. 2002)(citing Hoffman v. Red Owl Stores, Inc., 133 N.W.2d 267, 273 (Wis. 1965)). "A promise is a manifestation of intent by the promisor to be bound, and is to be judged by an objective standard." Id. at 880 (quoting Major Mat Co. v. Monsanto, 969 F.2d 579 (7th Cir. 1992)).

Stryker does not mention a "promise" in its brief. Rather, it argues that Spine Group's *conduct*—continuing to negotiate with Stryker after the 2008 agreements expired—and Stryker's reliance on the appearance that Spine Group was negotiating in good faith—was the equivalent of the "promise"

23

required to establish the first element of an estoppel claim. Dkt. No. 158 at 27. The court disagrees, and finds this claim to be a re-framing of Stryker's implied contract argument. The court already has found that the negotiations demonstrated that Spine Group did not intend continue to act as Stryker's exclusive distributor under the same arrangements that were set forth in the 2008 agreements. Indeed, as Stryker itself points out, the negotiations continued for some three years after the 2008 agreements expired (id.); rather that evidencing Spine Group's promise to continue as before, these protracted negotiations evidence an intent to change the contractual relationship. Stryker cannot establish the first element of an estoppel claim, and the court will grant summary judgment in favor of the plaintiffs on Count VII and dismiss Count VII of the amended counterclaim.

### D. There Are Disputed Issues of Material Fact As to Whether the Plaintiffs' Are Equitably Estopped from Asserting their Breach of Contract Claim against Stryker.

In Count II of the amended complaint, the plaintiffs alleged that the 2008 agreements provided that Spine Group was entitled to a termination payment as of the date the agreements terminated (December 31, 2010), and that Stryker has "repeatedly admitted" this. Dkt. N. 86 at ¶55. They alleged that despite the fact that Spine Group "complied with all of its obligations" under the contract, Stryker has not paid that termination fee. Id. at ¶¶56-57. Thus, they argue, they are entitled to summary judgment on the issue of whether Stryker breached the agreements by failing to make the termination payment.

24

In the brief in support of their motion for summary judgment, the plaintiffs argued that they are entitled to judgment on Count II of the amended complaint. Dkt. No. 140 at 39. They anticipated that Stryker would respond that it did not have to make the termination payment, and would support this argument with the assertion that Spine Group breached first by failing to return Stryker's products once the 2008 agreements terminated. Id. To head off that anticipated argument, the plaintiffs stated that Stryker never asked for the products to be returned; that, in fact, Stryker wanted the plaintiffs to keep the products and continue to sell them for Stryker. Id. The plaintiffs argued, therefore, that if they did breach the 2008 agreements, those breaches were not material. Id. at 40-41.

In its response to the plaintiffs' motions for summary judgment, Stryker argues—as the plaintiffs predicted that it would—that "Spine Group cannot prevail on its declaratory judgment claim that . . . it is entitled to a termination payment under the 2008 Agreements (Count II) . . . ." Dkt. No. 158 at 40-41. Stryker argues that, because Spine Group materially breached the 2008 agreements, it is not entitled to claim its termination payment—that Spine Group's breach excuses Stryker's breach. Id. at 41.

The plaintiffs replied that Stryker failed to identify how any breach was material, or to demonstrate that any breach was "prior" to Stryker's failure to make the termination payment. Dkt. No. 176 at 21. They argue that Stryker's assertion that Spine Group should've returned its product before it had to pay the termination payment is a "technicality defense," which flies in the face of

the intent of the contractual provision that the termination payment was due as long as Spine Group honored the one-year non-compete. Id.

In Metropolitan Sewerage Commission of Milwaukee Cnty. v. R. W. Const., Inc., 72 Wis. 2d 365, 387 (Wis. 1976), the Wisconsin Supreme Court stated, "Wisconsin has long followed the doctrine that a material breach by one party excuses subsequent performance by the other party." See also, Entzminger v. Ford Motor Co., 47 Wis. 2d 751, 755 ("a material breach by one party to a contract excuses subsequent performance by the other party") (citations omitted). Under Wisconsin law, then, "a material breach by one party may excuse subsequent performance by the other party." Management Computer Services, Inc. v. Hawkins, Ash, Baptie & Co., 206 Wis.2d 158, 183 (Wis. 1996) (citing R.W. Constr., 72 Wis.2d at 387; Entzminger, 47 Wis.2d at 755; and Shy v. Industrial Salvage Material Co., 264 Wis.118, 125 (Wis. 1953)).

"However, a party is not automatically excused from future performance of contract obligations every time the other party breaches." Id. "If the breach is relatively minor and not "of the essence", the plaintiff is himself still bound by the contract; he cannot abandon performance and get damages for a "total" breach by the defendant."" Id. (citations omitted). "The issue of whether a party's breach excuses future performance of the contract by the non-breaching party presents a question of fact." Id. (citing Shy, 264 Wis. at 125).

The court has found that Spine Group did breach the 2008 agreements, by failing to sign SRAs with all of the sales representatives, and by failing to return Stryker's products after termination. But in section V(A)(iii) above, the

26

court concluded that those breaches were not material, because Stryker did not suffer any damages. Thus, Stryker has not demonstrated that the plaintiffs' breach was *material*, sufficient to excuse their obligation to make the termination payment.

As noted above, however, Stryker argued in Count VII of the amended counterclaim/third-party complaint that the plaintiffs should be equitably estopped from pursuing their breach of contract claim because they took actions that Styker argues were intended to mislead Stryker into continuing negotiations that the plaintiffs knew never would result in a contract. While Wisconsin law does not allow the doctrine of promissory estoppel to be used as a *sword*, it does allow its use as a defensive *shield.* "It is clear from Wisconsin law that equitable estoppel may be used as a *defense*—a 'shield' as the Court and parties are referring to it . . . ." Schuetta v. Aurora Nat. Life Assur. Co., 30 F. Supp. 3d at 801. Thus, the court must consider whether the equitable estoppel defense which Stryker has raised involves a genuine dispute as to an issue of material fact.

In Bank v. Haster, Case No. 14-c-403, 2016 WL 750656 (E.D. Wis., February 23, 2016), Judge Randa described the elements of the equitable estoppel defense as follows:

> Equitable estoppel is a bar to the assertion of what would otherwise be a right; it does not of itself create a right. *Murray v. City of Milwaukee,* 252 Wis. 2d 613, 625 . . . (Wis. Ct. App. 2002) (citing *Utschig v. McClone*, 16 Wis. 2d 506, 509 . . . (Wis. 1962)). The requirements of equitable estoppel are: (1) action or inaction, (2) on the part of the one against whom estoppel is asserted, (3) which induces reasonable reliance thereon by the

27

other, either in action or non-action, and (4) which is to his or her detriment. *Id.* at 547 n.9 (citing *Milas v. Labor Ass'n of Wis., Inc.*, 214 Wis. 2d 1, 11-12 . . . (Wis. 1997)).

Id. at *9.

The court described, in the promissory estoppel section above, the actions Stryker alleges that the plaintiffs engaged in to intentionally lead it to believe that negotiations were ongoing, when in fact, the plaintiffs already had inked an agreement with Biomet. Those allegations, the court finds, raise several disputed issues of fact. Were the plaintiffs intentionally trying to mislead Stryker? Did Stryker rely on the actions the plaintiffs took? Was that reliance reasonable, given how long the negotiations went on without reaching resolution? Did that reliance accrue to Stryker's detriment? The answers to these disputed questions are necessary to determine whether the plaintiffs are equitably estopped from asserting their Count II breach of contract claim, and those questions are questions of fact best answered by a jury.

Because there are genuine disputes as to issues of material fact regarding whether Stryker has a valid equitable estoppel defense to the breach of contract claim in Count II of the amended complaint, the court will deny the plaintiffs' motion for summary judgment on Count II of the amended complaint, and will allow this claim to proceed to trial.

### E. Stryker Does Not Have A Tortious Interference With Contract Claim Against Biomet Or Healthwerks.

In Count II of the amended counterclaim, Stryker alleges that Biomet and Healthwerks tortiously interfered with Stryker's existing and prospective contracts with Spine Group. Dkt. No. 87 at ¶139.

28

Wisconsin law requires a plaintiff to prove five elements to prove a claim for "interference with a present or prospective contractual relationship." Burbank Grease Services, LLC v. Sokolowski, 717 N.W.2d 781, 796 (Wis. 2006). The plaintiff must prove that: "(1) the plaintiff had a contract or prospective contractual relationship with a third party; (2) the defendant interfered with the relationship; (3) the interference was intentional; (4) a causal connection exists between the interference and the damages; and (5) the defendant was not justified or privileged to interfere." Id.

   i.   *Spine Group and Stryker did not have a contract.*

The court already has found that there was no contract after December 31, 2010. The undisputed facts establish that Stryker and Spine Group were involved in negotiations extending at least two and a half years after the termination of the contract. Dkt. No. 138 at ¶53. Despite those negotiations, the parties never reached agreement on the terms of a new contract.

   ii.  *Biomet and Healthwerks did not interfere with an existing contractual relationship.*

By the time Biomet and Healthwerks came into the picture in 2013, there was no contractual relationship with which Biomet or Healthwerks could have interfered. That contractual relationship had ended three or so years earlier. So Biomet and Healthwerks could not have tortuously interfered with an existing contractual relationship.

### iii. *Biomet and Healthwerks did not interfere with an implied or expected contractual relationship.*

Stryker also asserts that it "had an implied contractual relationship and/or the expectancy of such a relationship" regarding prohibitions on competition, and that Biomet and Healthwerks interfered with those relationships. Dkt. No. 87 at ¶139. The court already has concluded that the parties did not have an implied contract. Even though tortious interference with prospective contract is a cognizable claim,[5] Stryker has failed to develop this argument in any of its briefs; Stryker argued only the existence of an implied contract. See Dkt. No. 158 at 15-16; Dkt. No. 113 at 20-22; Dkt. No. 173 at 16-19; Dkt. No. 115 at 16-27.

The court will grant summary judgment in favor of Biomet and the plaintiffs as to Count II, and dismiss Count II of the amended counterclaim.

### F. Spine Group, Healthwerks, Biomet And The Sales Representatives Did Not Tortiously Interfere With Stryker's Existing Business Relations.

In Counts IV and IX of the amended counterclaim/third-party complaint, Stryker alleges that Biomet, Healthwerks and Spine Group tortiously interfered with Stryker's prospective and existing business relations with its customers. Dkt. No. 87 at ¶167.

---

[5] See Shank v. William R. Hague, Inc., 192 F.3d 675, 687 (7th Cir. 1999) overruled by Hill v. Tangherlini, on other grounds, 724 F.3d 965 (7th Cir. 2013) ("Plaintiffs are correct in asserting that we stated in *Frandsen* that the tort of tortious interference 'has undergone a steady expansion and now embraces situations in which the interference is not with a contract right but merely with an expectation'")(citation omitted).

30

The parties begin by disputing whether Wisconsin recognizes the tort of tortious interference with prospective business relations. It does not.

In 1999, the Seventh Circuit addressed this inquiry in <u>Shank v. William R. Hague, Inc.</u>, 192 F.3d at 675. In <u>Shank</u>, international sales representatives sued for tortious interference with prospective business relationships after the manufacturer under contract with their distributor terminated that contract, stopped accepting orders from the sale representatives, and arranged for direct sales to international distributors. <u>Id.</u> at 678-79. The plaintiffs argued that tortious interference with prospective business relations was a subset of tortious interference with contract. <u>Id.</u> at 685-86.

The Seventh Circuit found that even though some state and federal courts used the terms "prospective economic relationship" and "prospective contracts" interchangeably, these courts did not intend to broaden the scope of the tort to include *prospective* business relations. <u>Id.</u> at 686, 688; <u>see also</u> <u>Nalco Chem. Co. v. Hydro Techs., Inc.</u>, 809 F.Supp. 672, 679 (E.D.Wis. 1992) (construing a tortious interference with business relations claim as a claim for intentional interference with contract "because tortious interference with business relations appears to be an obsolete cause of action"). After an analysis of the case law, the court concluded:

> When these cases are viewed in the proper light, it is clear to us that Plaintiffs' reliance on them to support their argument for a broader application of the tortious interference doctrine is misplaced. As we have set forth in detail above, none of these cases involved a court finding that mere economic or business relations with a third party was sufficient to create a cause of action under Wisconsin law for tortious interference in the

31

> absence of an existing contract or sufficiently concrete prospective contract. Instead, as the district court in the instant case fairly surmised, those cases stand for the larger proposition that a tortious interference claim cannot stand without a showing by the plaintiff that the defendant has interfered with some bargained-for right of his or, at a bare minimum, a "sufficiently certain, concrete and definite prospective [contract-like] relationship" between the plaintiff and the third party. Plaintiffs have shown neither.

Shank , 192 F.3d at 689.

Stryker alleges that Biomet, Healthwerks and Spine Group tortiously interfered with Stryker's prospective business relations with its customers. Dkt. No. 87 at ¶167. Because Wisconsin does not recognize the tort of tortious interference with *prospective* business relations, to the extent that Stryker alleges interference with an expectation of business relations, it has no claim. Dkt. No. 87 at ¶163.

Wisconsin *does* recognize the tort of tortious interference with *existing* business relationships. Shank, 192 F.3d at 689. But Stryker does not have a claim under that cause of action, either. Stryker identifies some situations in which the SAs spoke to Stryker customers about moving to Biomet while the SAs allegedly continued to represent Stryker, and some customers who purchased Stryker products from the SAs after termination of the contracts. Dkt. No. 114 at ¶¶108-10; 140-45. It also argues that the SAs had, over time, developed "long-term working relationships" with customers, and that the customers were loyal to the SAs and "recognized them as the face of Stryker Spine." Id. at ¶¶26, 29. But these allegations—the fact that the SAs were identified with Stryker, that they sold Stryker products to long-standing

32

customers, and that they talked to a couple of customers about moving to Biomet—are not sufficient demonstrate "sufficiently certain, concrete and definite prospective [contract-like] relationship[s]." <u>Shank</u>, at 689.

The court will grant summary judgment in favor of Biomet, the sales representatives, and the plaintiffs on Counts IV and IX, and will dismiss Counts IV and IX of the amended counterclaim.

### G. Spine Group, Healthwerks, Biomet, And The Sales Representatives Did Not Maliciously Injure Stryker's Business.

In Count V of the amended counterclaim, Stryker alleges that Spine Group, Healthwerks, Biomet and the sales representatives willfully and/or maliciously injured Stryker's business in violation of Wis. Stat. §134.01. Dkt. No. 87 at ¶¶176-179.

Wis. Stat. §134.01 states:

> Any 2 or more persons who shall combine, associate, agree, mutually undertake or concert together for the purpose of willfully or maliciously injuring another in his or her reputation, trade, business or profession by any means whatever, or for the purpose of maliciously compelling another to do or perform any act against his or her will, or preventing or hindering another from doing or performing any lawful act shall be punished by imprisonment in the county jail not more than one year or by fine not exceeding $500.

<u>See also</u> <u>Maleki v. Fine-Lando Clinic Chartered, S.C.</u>, 469 N.W.2d 629, 634 (Wis. 1991) (quoting §134.01). "Thus, to prevail at trial on a section 134.01 claim, a plaintiff must prove that (1) the defendants acted together; (2) with a common purpose to injure the plaintiff's reputation or business; (3) with

malice; and (4) the plaintiff suffered financial harm." <u>Virnich v. Vorwald</u>, 664 F.3d 206, 213 (7th Cir. 2011).

Biomet, Healthwerks, Spine Group and the sales representatives argue that even if Stryker could prove the other elements, it has presented no evidence of malice. Dkt. No. 140 at 36-37; Dkt. No. 101 at 29-30. The Seventh Circuit, interpreting Wisconsin law, has defined malice as "doing a harm malevolently for the sake of harm as an end in itself, and not merely as a means to some further end legitimately desired [such as hurting someone else's business by competition]." <u>Virnich</u>, 644 F.3d at 213 (quoting <u>Maleki</u>, 469 N.W.2d at 635). "[A]n *irrational* desire to cause harm for the sake of harm is actionable under section 134.01. A *rational* desire to cause harm for the sake of competitive advantage is not. [B]oth parties to the conspiracy must have acted out of malice for a plaintiff's section 134.01 claim to survive." <u>Id.</u> at 213-14 (emphasis in original). This claim "must not be based on the defendant's intent to gain a competitive advantage. To be actionable, the defendant's motive is not supposed to make sense. The plaintiff must allege and then prove an irrational desire to harm for harm's sake." <u>Id.</u> at 214.

Stryker does not allege "an irrational desire to harm for harm's sake." Dkt. No. 87 at ¶¶176-179. Biomet was Stryker's competitor. Dkt. No. 114 at ¶1. Stryker's contract with Spine Group terminated before Biomet started negotiating with Spine Group. Dkt. No. 102 at ¶¶ 17-18. It is unclear how Spine Group, Healthwerks, Biomet, or the sales representatives engaged in any conduct that a jury could construe as irrational, or as attempting to commit

34

"harm for harm's sake." As Stryker admits, Biomet simply wanted to obtain new business by taking over Stryker's territory. Dkt. No. 114 at ¶¶86, 89. No reasonable jury could find that this was an irrational intention.

The court will grant summary judgment in favor of the plaintiffs, Biomet, and the sales representatives on Count V, and dismiss Count V of the amended counterclaim.

### H.    A Genuine Dispute Of Material Fact Exists Regarding The Fraud Claim.

In Count VI of the amended counterclaim, Stryker alleges that Spine Group made false representations that Stryker reasonably relied upon to its detriment. Dkt. No. 87 at ¶¶185, 195.

In Wisconsin, "[t]he elements of a fraud claim are: (1) false representation; (2) intent to defraud; (3) reliance upon the false representation; and (4) damages." Mackenzie v. Miller Brewing Co., 623 N.W.2d 739, 745 (Wis. 2001). The false representation must consist of a purposeful act. Doe v. Archdiocese of Milwaukee, 700 N.W.2d 180, 193 (Wis. 2005).

> Fraud consists of a purposeful, volitional act on the part of the defrauding party." *Putnam v. Time Warner Cable,* 2002 WI 108, ¶ 27, 255 Wis.2d 447, 649 N.W.2d 626 (citing *Black's Law Dictionary* 670 (7th ed.1999)). As a general rule, a "misrepresentation" is required to support a claim of fraud. *Mackenzie v. Miller Brewing Co.,* 2001 WI 23, ¶ 18, 241 Wis.2d 700, 623 N.W.2d 739. "The general rule is that silence, a failure to disclose a fact, is not misrepresentation unless the nondisclosing party has a duty to disclose that fact." *Lecic v. Lane Co.,* 104 Wis.2d 592, 604, 312 N.W.2d 773 (1981).

Id.

35

The parties dispute key facts involving the fraud claim. Dkt. No. 158 at 25-26; Dkt. No. 176 at 12-13. Essentially, Styker argues that Spine Group's conduct, described below, intentionally led it to believe that their business relationship would continue into 2014. Dkt. No. 114 at ¶121.

On December 12, 2013, some of the sales representatives signed SRAs with Healthwerks and Biomet. Id. at ¶122. It follows that, by that date at the latest, Spine Group had finalized its plans to give its business to Biomet.[6] Stryker alleges that, after this date, Spine Group continued to communicate with Stryker as if it were continuing their relationship. For example, on December 12th, Breitenbach emailed Stryker about the potential contract. Id. at ¶122. On December 17th, 20th, and 30th, Breitenbach and Potokar[7] allegedly participated in telephone conferences with Stryker about the potential contract. Id. at ¶¶123-24. On December 20th, Breitenbach asked his assistant to register him and some representatives for Stryker's January 16th sales conference. Id. at ¶125. On December 30th, Breitenbach reassured Stryker that he was attending the sales meeting. Id. at ¶126. On January 6, 2014, Potokar left a voicemail for Stryker about going over the 2014 budget. Id. at ¶128.  Stryker argues that it relied on the communications, because it continued to send additional revised contracts. Id. at ¶ 127.

---

[6] Spine Group, Healthwerks and Biomet did not execute an exclusive sales representative agreement until December 26, 2013. Dkt. No. 102 at ¶38; Dkt. No. 114 at ¶114.

[7] The parties dispute whether Potokar was a Spine Group principal. Dkt. No. 163 at ¶31.

36

Stryker argues that Spine Group took the above actions for the purpose of maximizing damage to Stryker's business. Dkt. No. 158 at 26. Stryker argues that Spine Group intentionally delayed informing Stryker that it did not intend to enter into a new contract in order to leave Stryker with no representation in the area and no time to find new representation, allowing Biomet to easily take over. Spine Group disputes whether many of these communications even occurred. Dkt. No. 163 at 55. Because there are genuine disputes as to issues of material fact regarding the fraud claim, the court will deny summary judgment on Count VI of the amended counterclaim/third-party complaint, and allow that claim to proceed to trial.

### I. Spine Group And The Sales Representatives Did Not Owe Stryker A Fiduciary Duty At The Time Of The Alleged Conduct.

In Count X of the amended counterclaim/third-party complaint, Stryker alleges that Spine Group and the sales representatives breached the fiduciary duty owed to it. Dkt. No. 87 at ¶241.

"Generally, there are two types of fiduciary relationships: (1) those specifically created by contract . . . and (2) those implied in law due to the factual situation surrounding the transactions and relationships of the parties to each other and to the questioned transactions." Production Credit Ass'n of Lacaster v. Croft, 423 N.W.2d 544, 546 (Wis. Ct. App. 1988) (citing Denison State Bank v. Madeira, 640 P.2d 1235, 1241 (Kan. 1982)).

Stryker alleges that Spine Group and the Sales Representatives owed it a fiduciary obligation after the contract expired. Dkt. No. 87 at ¶238. The facts do not support this assertion. As explained in the breach of contract section,

37

there was no valid contract after December 10, 2010 and no further obligations after December 31, 2011. Even if the 2008 agreements remained enforceable, the express language in each agreement provides that it is not to be construed to create a principal/agent relationship. Dkt. No. 119-99 at ¶14. Consequently, Spine Group and the sales representatives did not owe Stryker a contractual fiduciary duty.

Nor did Spine Group and the sales representatives owe Stryker an implied fiduciary duty. Courts generally imply a fiduciary relationship to balance the powers. Id. at 547 ("Manifest in the existence of a fiduciary relationship is that there exists an inequality, dependence, weakness of age, of mental strength, business intelligence, knowledge of facts involved, or other conditions giving to one an advantage over the other.")(citing Denison State Bank, 640 P.2d at 1241). Stryker and Spine Group are sophisticated parties in the midst of negotiating a new contract when the alleged conduct occurred. Dkt. No. 114 at ¶121. The sales representatives are the less sophisticated party in comparison to Stryker. Neither situation is one in which the court needs to balance the powers.

The court will grant summary judgment in favor of Spine Group and the sales representatives as to Count X, and dismiss Count X of the amended counterclaim.

## VI.  CONCLUSION

The court **GRANTS** Biomet's motion for summary judgment. Dkt. No. 100.

The court **DENIES** Stryker's motion for summary judgment. Dkt. No. 112.

The court **GRANTS** the plaintiffs' motion for summary judgment in their favor as to Count I of the amended complaint, and **DENIES** the plaintiffs' motion for summary judgment in their favor as to Count II of the amended complaint. Dkt. No. 120.

The court **DENIES** the plaintiffs' motion for summary judgment in their favor as to Count VI of the amended counterclaim/third-party complaint. Dkt. No. 120.

The court **GRANTS** the sales representatives' motion for summary judgment (Dkt. No. 121).

The court **DISMISSES** Counts I, II, III, IV, V, VII, VIII, IX and X of the amended counterclaim/third—party complaint.

The court will allow Count VI of the amended counterclaim/third-party complaint and Count II of the amended complaint to proceed to trial. The court will schedule a separate hearing date, to discuss with the parties trial scheduling issues.

Dated in Milwaukee, Wisconsin this 30th day of September, 2016.

BY THE COURT:

HON. PAMELA PEPPER
United States District Judge

Case 2:14-cv-00093-PP   Filed 09/30/16   Page 39 of 39   Document 215